IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SYNERGY TECH & DESIGN INC. d/b/a
ROAD ARMOR,

    Plaintiff,

v.

JIM TERRY, SANDY TERRY, JIM MEEKINS, DIXIE MEEKINS, JD DISTRIBUTING, and ROAD ARMOR USA,

    Defendant.

No. C 06-02073 JSW

**ORDER (1) GRANTING MOTION TO AMEND THE COMPLAINT; (2) GRANTING MOTION FOR DISCOVERY SANCTIONS; (3) AND DENYING MOTION FOR DISQUALIFICATION**

Now before the Court are the motions filed by Plaintiff Synergy Tech & Design Inc. ("Synergy" of "the company") to amend the complaint and for discovery sanctions and Defendant Jim Terry's motion to disqualify the Seed IP Law Group PLLC ("Seed Law Group"). Having considered the parties pleadings, the relevant legal authority, and having had the benefit of oral argument, the Court hereby GRANTS Plaintiff's motion to amend the complaint, GRANTS Plaintiff's motion for discovery sanctions, and DENIES Defendant Jim Terry's motion for disqualification.

## FACTUAL BACKGROUND[1]

Defendant Jim Terry was President and Chief Executive Officer of Plaintiff Synergy on August 17, 2005, when he met for lunch with Kevin Costanza of the Seed Law Group, as well

---

[1] Both parties submitted substantial evidence and many objections to the evidence. Much of the evidence objected to was not necessary to the resolution of this motion. Therefore, the Court need not rule on the admissibility of such evidence at this time. To the extent the Court relied on and cited evidence objected to in resolving the motion, the objections are overruled.

as Gabe Gile, a Synergy employee, and David Seeley, Synergy's general corporate counsel. (Supplemental Declaration of Jim Terry ("Terry Suppl. Decl."), ¶ 3; Declaration of Kevin Costanza ("Costanza Decl."), ¶ 2; Declaration of David J. Seeley ("Seeley Decl."), ¶ 4; Declaration of Gabe Gile ("Gile Decl."), ¶ 7.) Synergy's corporate counsel had recommended Mr. Costanza and the Seed Law Group to address the company's intellectual property needs. (Seeley Decl., ¶ 3.)

Among other issues relating to the company's intellectual property needs, the lunch meeting included a discussion of a pending axle design and the filing of provisional patent application. (Gile Decl., ¶ 2; Terry Decl., ¶ 4; Suppl. Terry Decl., ¶ 7; Costanza Decl., ¶ 3.) The record indicates that the filing of the provisional patent on the axle design was necessary because Mr. Terry wished to introduce the axle design to the public at an upcoming trade show and wanted to protect the intellectual property value of the design before that show. (Suppl. Terry Decl., ¶ 8; Suppl. Costanza Decl., ¶ 5.)

As a result of the August 17 meeting with Mr. Costanza in which the parties discussed the intellectual property needs of the company, Mr. Terry, on behalf of Synergy, signed an engagement letter with the Seed Law Group. (Plaintiff's Exhibit 1 from April 13, 2007 hearing on motion; Costanza Decl., ¶¶ 4-5.) The engagement letter, dated August 29, 2005, contained the following provision:

> Our representation is limited to Synergy Tech & Design Inc. d/b/a Road Armor, and does not extend to any directors, officers, employees, consultants, or other affiliates. The scope of representation is limited to intellectual property matters.

(Plaintiff's Exhibit 1 from April 13, 2007 hearing on motion at 2.) The engagement letter further estimated charges for "[p]reparation and filing of U.S. Design Patent Application (client to provide finished drawings)." (*Id.* at 1.) The Seed Law Group sent the engagement letter less than two weeks after the lunch meeting and Jim Terry signed it on behalf of Synergy expressly confirming that the Seed Law Group was retained to represent Synergy and expressly disclaiming any individual representation. (*Id.*, Costanza Decl., ¶ 4.)

The filing of a provisional patent was addressed at the initial meeting with Mr. Costanza and was explicitly the subject of the engagement letter memorializing the parties' earlier

discussion. (Costanza Decl., ¶ 4.) The Seed Law Group's bill for the fees and costs incurred in filing the provisional patent was addressed to Synergy. (Costanza Decl., ¶ 11; Suppl. Costanza Decl., ¶ 2, Ex. 1.) The record demonstrates that the Seed Law Group's retainer amount as well as the bill for the fees and expenses incurred as a result of the filing of the provisional patent were indeed paid by Synergy. (Declaration of Pete Dahmen, ¶ 5, Ex. 2; Supplemental Declaration of Peter Carl Dahmen ("Suppl. Dahmen Decl."), ¶ 2; Supplemental Declaration of Mark Hanson ("Suppl. Hanson Decl."), ¶ 3.) In addition, Synergy paid for the materials and production of the prototype axle design as well as the costs to send the prototype to the trade show. (Suppl. Hanson Decl., ¶ 3; Suppl. Dahmen Decl., ¶ 4.)

Mr. Terry contends that he discussed an axle design of his own creation with Mr. Costanza at that same August 17 lunch meeting. (Declaration of Jim Terry, ¶ 4; Terry Suppl. Decl., ¶ 7.) Fellow Synergy employee, Gabe Gile, states that he in fact conceived of the idea and design for the axle that was the subject of the provisional patent application. (Gile Decl., ¶ 3.) Mr. Gile states that Mr. Terry was merely involved in transferring Mr. Gile's axle design into the proper format for CAD drawings to submit with the application. (*Id.*, ¶ 4.) Another employee of Synergy, Mark Nobles, recalls that he personally witnessed Mr. Gile sketch the design while repeatedly trying to explain the design to Mr. Terry. (Declaration of Mark Nobles, ¶ 2.) Mr. Nobles also witnessed Mr. Terry drawing the axle design in the CAD software at Mr. Gile's direction. (*Id.*, ¶ 3.) Mr. Terry delivered the CAD drawings to the Seed Law Group as contemplated by the engagement letter. (Suppl. Costanza Decl., ¶¶ 3-4; Suppl. Terry Decl., ¶ 9.)

Regardless of who the actual inventor was, Mr. Costanza prepared a provisional patent application which listed Jim Terry as the first named inventor and submitted the drawings listing "Jim Terry et al." as the inventors. (Supplemental Declaration of Kevin Costanza ("Suppl. Costanza Decl."), ¶ 4, Ex. 3; Costanza Decl., ¶ 7.) The provisional patent was submitted on September 23, 2005. (Suppl. Costanza Decl., ¶ 4, Ex. 3.) Although Mr. Costanza believed the provisional patent application was filed on behalf of Synergy, such an application must name an individual person, not a corporate identity, as the inventor. (Costanza Decl.,

3

¶¶ 3-7, 10.) After the filing of the provisional patent, on November 3, 2005, Mr. Costanza of the Seed Law Group forwarded a correction of inventorship and an assignment agreement to Mr. Terry and Mr. Gile. (Suppl. Costanza Decl., ¶ 6, Ex. 4; Gile Decl., ¶ 8.)

Shortly thereafter, on November 21, 2005, Synergy fired Mr. Terry from his position as the company's CEO. (Gile Decl., ¶ 8.) Mr. Terry never signed and returned the assignment agreement. (Costanza Decl., ¶ 8; Terry Decl. ¶ 5, Suppl. Terry Decl., ¶¶ 9, 11.)

Mr. Terry contends that the filing of the provisional patent on the axle design was made on his behalf as an individual, and that such filing by the Seed Law Group created an attorney-client relationship. Based on his understanding of the creation of an attorney-client relationship, Defendant Mr. Terry moves to disqualify the Seed Law Group from its current representation of Plaintiff Synergy.

The Court will address additional facts as necessary in the analysis.

**PROCEDURAL BACKGROUND**

Plaintiff has moved to amend the complaint to add causes of action for trademark infringement counts under 15 U.S.C. § 1114 for Plaintiff's recently issued federal trademarks. Plaintiff also moves for sanctions and to enforce the Court's discovery orders requiring Jim and Sandy Terry to produce all documents responsive to Plaintiff's outstanding documents requests. In addition, Defendant Jim Terry moves to disqualify the Seed Law Group due to what they contend is a conflict of interest between the Seed Law Firm and its representation of Synergy.

**ANALYSIS**

**A.   Motion to Amend.**

    **1.   Legal Standard on Motion to Amend.**

Federal Rule of Civil Procedure 15(a) permits a party to amend its pleading once as a matter of right at any time before a responsive pleading is served. Once a responsive pleading has been served, however, amendment requires written consent of the adverse party or leave of the court. In accordance with the Federal Rule's liberal pleading standard, leave of the Court "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Though the decision to grant or deny a motion for leave to amend is governed by the district court's discretion, the

4

1   general rule is that amendment of the pleadings is to be permitted unless the opposing party
2   makes a showing of bad faith, undue delay, prejudice to the opposing side, and futility of
3   amendment.  *See Forman v. Davis*, 371 U.S. 178, 230 (1962);  *DCD Programs, Ltd. v.*
4   *Leighton*, 833 F.2d 183, 186 (9th Cir. 1986).

5   **2.   Leave to Amend Granted.**

6   Synergy requests that the Court grant leave to amend its complaint to add federal
7   trademark infringement counts under 15 U.S.C. § 1114 for Plaintiff's recently issued federal
8   trademarks, including Registration No. 3,162,761 for "ROAD ARMOR" and 3,185,702 for
9   "ROAD ARMOR" (design).  The original complaint recites that Plaintiff is the owner of the
10  "ROAD ARMOR" trademark, and gave notice to Defendants of the underlying federal
11  trademark applications that were the basis for Plaintiff's recently registered marks.  (Compl.,
12  ¶¶ 21-26.)  It is uncontested that when the federal registrations issued, Synergy notified
13  Defendants of each issuance and Defendants raised no objection at that time to Plaintiff's stated
14  intention to amend its complaint to add claims under the issued trademarks.

15  Defendants Jim and Sandy Terry contend that Synergy should not be granted leave to
16  amend the complaint to include a cause of action for federal trademark infringement because
17  Synergy's applications for the trademark registrations post-date the filing of the original
18  complaint in this matter.  The Terrys contend that Synergy is trying to allege a claim for
19  violation of its federal trademark rights retroactively which would subject them to additional
20  types of damages.  The Terrys contend that all rights to a cause of action for infringement of a
21  registered trademark begin to accrue at the time of registration.  (Terrys Opp. Br. at 2-3.)
22  Defendants James Meekins, Dixie Meekins and JD Distributing (collectively, the "Meekins
23  Defendants") oppose the proposed amendment because, they claim, they unilaterally ceased any
24  new use of the disputed "Road Armor USA" name prior to the date of the registration of the
25  disputed marks and have ceased to use the website www.roadarmorusa.com.   (Meekins Opp.
26  Br. at 2.)

27  Synergy's request for leave to amend satisfies the liberal standard of Rule 15(a).
28  Defendants have not made a showing of bad faith, undue delay, prejudice, or futility of

United States District Court
For the Northern District of California

amendment. *See Forman*, 371 U.S. at 230. To the extent the Terrys argue the addition of the cause of action for federal trademark infringement creates additional damages, the unfair competition claims under the Lanham Act provide the same types of remedies as claims for infringement. *U-Haul Int'l, Inc. v. Jartain, Inc.*, 793 F.2d 1034, 1042 (9th Cir. 1986) (federal unfair competition claim under Section 43(a) of the Lanham Act for unregistered trademarks provides the same remedies as claim under 15 U.S.C. § 1117(a) such as damages, enhanced damages, profits, costs, and attorneys' fees). To the extent the Terrys contend Synergy would not be entitled to damages for alleged activities occurring prior to the registration, there is no potential for Synergy to recover under the new cause of action for federal trademark infringement for conduct that occurred prior to the registration of the subject marks. (*See* Reply at 7-8; *see also Reliable Tire Distributors, Inc. v. Kelly Springfield Tire Co.*, 592 F. Supp. 127, 136 (E.D. Penn. 1984).) Synergy only seeks to amend to add a claim for federal trademark infringement for continued alleged infringing activity occurring after registration.

In addition, the question of whether the Meekins Defendants continue to infringe the subject trademark is a question of fact, inappropriate for resolution at this procedural stage. *See Letizia v. Prudential Bache Securities, Inc.* 802 F.2d 1185, 1189 (9th Cir. 1986) (holding that court may deny motion to amend where amendment would be futile, *i.e.*, where "*no* set of facts under [the] proposed amended complaint would entitle [plaintiff] to relief, ... but it would be premature for the district court to require a factual showing from [plaintiff]" at the motion to amend stage).

Accordingly, the Court GRANTS Synergy's motion to amend the complaint to add federal trademark infringement counts under 15 U.S.C. § 1114 for Plaintiff's recently issued federal trademarks. Synergy must file the amended complaint by no later than 10 days after issuance of this Order.

**B.   Motion for Discovery Sanctions.**

By separate motion, Synergy moves to enforce the Court's Order dated November 28, 2006 regarding a discovery dispute and move for sanctions and attorneys' fees against Defendants Jim and Sandy Terry and their counsel for violation of this Court's Order. The

Court's prior order required that the Terrys respond to Synergy's outstanding documents requests with all responsive documents currently in their possession or control by no later than December 5, 2006 at 4:00 p.m. The Court also ordered that "[t]o the extent the Terrys currently do not have in their possession or control any responsive documents, the Terrys are ordered to produce a declaration under penalty of perjury detailing the specific efforts made to locate responsive documents and that they have produced all documents they have located." (Order dated November 28, 2006 at 1.)

In response, the Terry Defendants produced 82 pages of e-mails, without the referenced attachments, with the most recent e-mail dating back 6 months, and a declaration from Jim Terry. Mr. Terry's declaration stated that his initial response to Plaintiff's documents requests was that he had no responsive documents due to the repossession of the Synergy computer, but that he had recently recovered responsive e-mails. (Declaration of Inge Larish in support of sanctions motion ("Larish Sanctions Decl."), Ex. D.) Further, Mr. Terry declared that he had "no further documents in [his] possession that are responsive to Plaintiff's demands." (*Id.*)

The record before the Court indicates that there may be more documents – both e-mails and other documentary evidence – in the Terrys' possession that are responsive to Synergy's 48 documents requests. In particular, the attachments to the produced e-mails are responsive to the outstanding requests. Additionally, in their opposition to the current motion, counsel for the Terrys indicates that he has recently engaged a computer forensics company to identify and image potentially responsive documentary evidence. (Declaration of Stuart E. Jones in opposition to motion for sanctions, ¶ 9 (indicating that counsel has received 36 gigabytes of data from computer forensic company and is currently reviewing the data to "determine which documents are responsive to Synergy's discovery requests, if any.").) There is no explanation in the record justifying the substantial delay in initiating the forensic search for responsive documents.

It is clear from the current record that the Terrys have not fully complied with the Court's order dated November 28, 2006. The document requests were served on September 21, 2006. The Court order required full production by December 5, 2006. The deadline for close

7

1  of non-expert discovery is fast-approaching.  The Court hereby ORDERS that the Terrys (both
2  Jim and Sandy) shall respond without objection (which the Court finds have been waived) to
3  Plaintiff's outstanding documents requests with ALL responsive documents currently in their
4  possession or control by no later than May 21, 2007 at 4:00 p.m.  Again, to the extent the Terrys
5  do not have in their possession or control any documents responsive to any particular
6  documents request, the Terrys are ORDERED to produce a declaration under penalty of perjury
7  detailing the <u>specific</u> efforts of both Jim and Sandy Terry to locate documents responsive to
8  <u>each</u> individual request in Synergy's outstanding discovery requests and shall include a
9  statement of efforts made to find and produce documents generated after the Terrys left Road
10 Armor on November 21, 2005 to the present.  The two declarations shall by produced by no
11 later than May 23, 2007 at 4:00 p.m.

12 Due to the tardiness in responding both to the outstanding requests and the Terrys'
13 failure to comply with this Court's order, the Court is amenable to continuing the deadline for
14 further non-expert discovery, upon the parties' request.

15 In addition, due to the delay and flagrant non-compliance with their discovery
16 obligations and with this Court's order, as explained by the Court to the parties at oral argument
17 on April 13, 2007, the Court HEREBY ORDERS Jim and Sandy Terry to pay $4,245.75 to the
18 Seed IP Law Group PLLC by no later than May 23, 2007 at 4:00 p.m.  *See* Fed. R. Civ. P.
19 37(a)(4)(A).  This amount constitutes the total incurred by Synergy billed by its counsel to
20 pursue the outstanding discovery and file the motion for sanctions.  (*See* Larish Sanctions Decl.,
21 Ex. O.)

22 **C.    Motion for Disqualification of Seed Law Group.**
23      **1.    Applicable Law.**

24 Lawyers who appear before the United States District for the Northern District of
25 California are required to comply with the California Rules of Professional Conduct.  *See* Civ.
26 L.R. 11-4(a)(1) (requiring that all members of the bar of this Court and attorneys permitted to
27 practice before the Court pro hac vice must be "familiar and comply with the standards of
28 professional conduct required of members of the State Bar of California").  Under the governing

professional rules, a lawyer shall not, without the informed written consent of each client, accept representation of more than one client or accept employment adverse to a former client, where, by reason of the representation of the former client, the lawyer has obtained confidential information material to the employment. *See* Cal. Rule Prof'l Conduct 3-310. The standard for determining whether disqualification must be decided under California law.

### 2. Elements of Disqualification.

A motion for disqualification of counsel is a drastic measure which courts should hesitate to impose except in circumstances of absolute necessity. *In re Marvel*, 251 B.R. 869, 871 (N.D.Cal. 2000), citing *Schiessle v. Stephens*, 717 F.2d 417 (7th Cir.1983). Such motions are often tactically motivated and they tend to derail the efficient progress of litigation. *Evans v. Artek Systems Corp.*, 715 F.2d 788, 791 (2d Cir.1983). The moving party, therefore carries a heavy burden and must satisfy a high standard of proof. *Id.* Because of the potential for abuse, disqualification motions should be subjected to particularly strict judicial scrutiny. *Optyl Eyewear Fashion International Corp. v. Style Companies, Ltd.,* 760 F.2d 1045, 1049 (9th Cir. 1985), citing *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721-22 (7th Cir. 1982). Further, the cost and inconvenience to clients and the judicial system from misuse of the rules for tactical purposes is significant. *Optyl Eyewear,* 760 F.2d at 1049, citing Brown & Brown, *Disqualification of the Testifying Advocate-A Firm Rule?* 57 N.C.L. Rev. 595, 619-621 (1979). Because of this potential for abuse, disqualification motions should be subjected to "particularly strict judicial scrutiny." *Id.*, citing *Rice v. Baron,* 456 F. Supp. 1361, 1370 (S.D.N.Y. 1978); *see also Freeman,* 689 F.2d at 721-22.

### 3. Concurrent or Successive Representation.

Under California law, concurrent representation is not permitted. This "dispositive principle ... can be derived from the well established ethical stricture against attorney conflicts of interest embodied in rule 3-310 of our Rule of Professional Conduct ... [which] provides that an attorney 'shall not ... [a]ccept or continue representation of more than one client in a matter in which the interests of the clients actually conflict....' The practical administration of the rule has not been confined to what is perhaps the most egregious example of its violation –

9

simultaneously representing opposing parties in the same litigation." *Flatt v. Superior Court*, 9 Cal. 4th 275, 282-83 (1994). Even where the simultaneous representations may have nothing in common, disqualification, in all but a few instances, is a *per se* or automatic one. *Id*. at 284.

When an attorney's conflict of interest arises from successive representation of clients of potentially adverse interests, however, the principal question is whether there is a "substantial relationship" between the subjects of the former and current relationships. *Id*. at 283. The determination whether a "substantial relationship" exists requires an inquiry into the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement. *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft*, 69 Cal. App. 4th 223, 234 (1999), citing *H.F. Ahmanson & Co. v. Salomon Brothers, Inc.*, 229 Cal. App. 3d 1445, 1455 (1991). In addition, it must be shown that the information from the prior representation is material to the current employment. *Morrison*, 69 Cal. App. 4th at 234, citing Rule 3-310(E). As part of its review, the court should examine the time spent by the attorney on the earlier case, the type of work performed, and the attorney's possible exposure to formulation of policy or strategy. *Morrison*, 69 Cal. App. 4th at 234, citing *H.F. Ahmanson*, 229 Cal. App. 3d at 1455. Successive representations will be considered substantially related where the facts support a "rational conclusion that information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues." *Jessen v. Hartford Casualty Ins. Co.*, 111 Cal. App. 4th 698, 713 (2003) (citations omitted).

Where the requisite substantial relationship exists, "access to confidential information by the attorney in the course of the first representation (relevant, by definition, to the second representation) is *presumed* and disqualification of the attorney's representation of the second client is mandatory; indeed, the disqualification extends vicariously to the entire firm." *Flatt*, 9 Cal. 4th at 283.

First, however, the party moving for disqualification must show that an attorney-client relationship exists or existed. "Before an attorney may be disqualified from representing a party

in litigation because his representation of that party is adverse to the interest of a current or former client, it must first establish that the party seeking the attorney's disqualification was or is 'represented' by the attorney in a manner giving rise to an attorney-client relationship." *Koo v. Rubio's Restaurant, Inc*., 109 Cal. App. 4th 719, 729 (2003). To "state the obvious, an attorney's duty to his or her client depends on the existence of an attorney-client relationship. If that relationship does not exist, the fiduciary duty to a client does not arise." *Fox v. Pollack*, 181 Cal. App. 2d 954, 959 (1986) (citations omitted). In this matter, Mr. Terry bears the burden of demonstrating the existence of an attorney-client relationship between the Seed Law Group and Mr. Terry as an individual.

**4.      Formation of the Attorney-Client Relationship Under Washington Law.**

Because in this matter, both the attorneys and the possible past and present clients are located in the State of Washington, the adjudication of the existence of either formation and/or termination of the attorney-client relationship must be determined pursuant to Washington law. Under Washington law, determining whether or not an attorney-client relationship exists is based on whether the attorney's advice or assistance is sought and received on legal matters. *Bohn v. Cody*, 119 Wash. 2d 357, 363 (1992), citing 48 Am. Jur. Proof of Facts 2d, *Existence of Attorney-Client Relationship* 525 (1987); 1 R. Mallen & J. Smith, *Legal Malpractice* § 11.2 n.12 (3d ed. 1989). The relationship need not be formalized in a written contract, but rather may be implied from the parties' conduct. *Id*., citing *In re McGlothlen*, 99 Wash. 2d 515, 522 (1983). "The existence of the relationship 'turns largely on the client's subjective belief that it exists.'" *Id.*, citing *McGlothlen*, 99 Wash. 2d at 522. "The client's subjective belief, however, does not control the issue unless it is reasonably formed based on the attending circumstances, including the attorney's words and actions." *Id*., citing 1 R Mallen & J. Smith § 8.2 n.12; *Fox v. Pollack*, 181 Cal. App. 3d at 959; *In re Petrie*, 154 Ariz. 295, 299-300 (1987).

The individual's subjective belief regarding the existence of an attorney-client relationship must be reasonably based on all of the attending circumstances. Mr. Terry contends that his interactions with the Seed Law Group created an independent attorney-client relationship between himself as an individual and the firm. In this matter, the Court finds that

11

1 Mr. Terry's subjective belief that an attorney-client relationship was formed by the Seed Law
2 Group's filing of the provisional patent application with Mr. Terry's name listed as the inventor
3 is not reasonable based on all of the attending circumstances. The engagement letter sent to Mr.
4 Terry as the CEO of Synergy memorialized an in-person meeting in which the intellectual
5 property needs of Synergy were discussed by corporate counsel, as well as by the corporation's
6 CEO and an another employee. The engagement letter, drafted and signed within two weeks of
7 the meeting, clearly sets out the limitation of the engagement to intellectual property matters
8 and explicitly circumscribes the scope of the representation to Synergy as a corporate entity and
9 not to its directors and officers. The engagement letter further memorializes the discussion of
10 the intended provisional patent application to be timely prepared in anticipation of the
11 upcoming trade show. Mr. Terry, acting as CEO of Synergy, signed the agreement so
12 memorializing the parties' discussion from just two weeks earlier. Further, the record
13 demonstrates that Synergy was billed for and paid for all of the filing fees and expenses as well
14 as the design, manufacture and delivery of the axle prototype.

15 Although it is entirely unclear from the present record whether Mr. Terry was indeed the
16 inventor of the subject axle design, it is clear that the filing of the provisional patent was made
17 at the bequest of Synergy.[2] The listing of Mr. Terry as the individual inventor was made
18 necessary by the rules governing the filing of patents and does not alter the parties' previous
19 discussions and the memorialization of those discussions in the law firm's engagement letter
20 with its corporate client. The moving party bears a substantial burden of demonstrating a
21 conflict of interest and, in light of the express disclaimer of representation and the
22 circumstances surrounding the engagement of the law firm by Synergy, Mr. Terry cannot
23 demonstrate a reasonable belief that an attorney-client relationship was formed between himself
24 as an individual and the Seed Law Group. The Court finds that the firm's representation of

---

[2] It is also clear from the record before this Court that the information transmitted to the Seed Law Group from Mr. Terry was shared with other employees of Synergy. (*See, e.g.*, Nobles Decl., ¶ 3; Gile Decl., ¶5, Ex. 2; Suppl. Dahmen Decl., ¶ 3, Ex. 2.) The fact that Mr. Terry shared important information about the axle design with other Synergy employees is further evidence that he did not have a contemporaneous reasonable expectation that his relationship with the Seed Law Group was based on confidential attorney-client disclosures made by him as an individual.

12

Synergy in this lawsuit does not create an impermissible conflict of interest. Accordingly, Defendant Terrys' motion to disqualify counsel is hereby DENIED.

## CONCLUSION

Based on the foregoing reasons, the Court GRANTS Plaintiff's motion to amend the complaint to add federal trademark infringement causes of action under 15 U.S.C. § 1114 for Plaintiff's recently issued federal trademarks. Plaintiff shall file an amended complaint no later than 10 days from issuance of this Order. In addition, the Court GRANTS Plaintiff's motion for discovery sanctions for the Terrys' noncompliance with their discovery obligations and this Court's previous discovery orders. All responsive documents shall be produced by no later than May 21, 2007 at 4:00 p.m. and two declarations from Terry and Sandy Terry detailing their specific efforts to comply with the outstanding documents requests as well as a check made out to the Seed Law Group in the amount of $4, 245.75 paid by the Terrys shall be due no later than May 23, 2007 at 4:00 p.m. Lastly, because the Court finds that Mr. Terry has failed to demonstrate the existence of an attorney-client relationship between himself as an individual during his tenure at Synergy and the Seed Law Group, the Court does not find a conflict of interest exists and DENIES the motion to disqualify counsel.

**IT IS SO ORDERED.**

Dated: May 2, 2007

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE